**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| VERNON J. WILLIAMS, et al, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Case No.: 04-632-BH-C |
| | ) | |
| FRESENIUS MEDICAL CARE | ) | |
| NORTH AMERICA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter is before the Court on Defendant Fresenius Medical Care North America, Inc.'s (hereinafter, "FMCNA") Motion (Doc. 49) for Summary Judgment. Plaintiffs have filed a Response (Doc. 57) to the motion and Defendant has, in turn, filed a Reply (Doc. 80) to the Response. In addition, Plaintiffs have motioned (Doc. 83) to Strike several exhibits filed by Defendant in conjunction with their Reply to Plaintiffs' Response to the motion for summary judgment and Defendant has Replied (Doc. 88) to Plaintiffs' motion. Based upon all of the aforementioned pleadings and all relevant evidence submitted therewith, the Court finds that Defendant FMCNA's Motion (Doc. 49) for Summary Judgment is **due to be GRANTED IN PART and DENIED IN PART**. Furthermore, the Court finds that Plaintiffs' Motion (Doc. 83) to Strike several exhibits submitted by Defendant is **due to be DENIED**.

**FACTS**

**I.      FMCNA's Restructuring and Alleged Discriminatory Action**

1.      Defendant FMCNA is a national provider of dialysis services to individuals with

chronic kidney failure.[1]

2.      In the Mobile area, it operates 14 free standing clinics and four acute care programs in area hospitals.

3.      Prior to April 2003, there were generally two technical positions within each facility: Equipment Technicians and Chief Technicians.  The Chief Technicians supervised the Equipment Technicians within a given facility.

4.      The Chief Technician assigned to each facility was responsible for all technical functions in the facility including the regulatory, inventory, compliance and maintenance functions.  (Pls.' Br. Supp. Resp. Summ. J., Doc. 57, p. 2).

5.      When a Chief Technician's responsibilities were expanded to oversee two clinics, they were promoted to the position of Area Chief Technician.

6.      In 2003, Defendant FMCNA, as part of a broader restructuring throughout its entire North American operations, implemented a "centralized-technical" mode of operation in its East Business Unit.

7.      Centralized technical required organizing each area's technical operation so that the technical/maintenance departments were no longer clinic based; rather, each area was organized by function and headquartered in one facility.

8.      As part of this restructuring, Elliot Sierra, a Puerto Rican, was promoted to Technical Operations Manager.  It became one of his responsibilities to implement centralized technical in the Mobile-area facilities.  (Def.'s Mem. Supp. Summ. J., Doc. 49-1, p. 4).

---

[1] Unless otherwise noted, these facts have been agreed upon in the Parties' Joint Pretrial Order (Doc. 93-1).

9.      As part of the restructuring, Sierra established four supervisory positions within the technical department.  These supervisory positions were:  Central Program Manager, essentially the lead manager of the Mobile technical operation; Compliance Manager; Inventory Manager and Technical Supervisor.  Though still supervisory, the positions of Compliance Manager, Inventory Manager and Technical Supervisor were all subordinate to the Central Program Manager.  *Id*. at 6.

10.     The non-supervisory positions in this structure were simply referred to as technicians.  They would report to one of the three intermediate supervisory positions.  *Id*.

11.     In April 2003, Sierra announced how the restructured Mobile technical operation would be staffed.

12.     Tony Chapman, white, was promoted to Central Program Manager.

13.     Below him, Clint Freeman, white, was promoted to Compliance Manager, Hayes McQueen, white, was promoted to Inventory Manager and Richard Morton, white, to Technical Supervisor.

14.     Plaintiffs, Carl Coker, Dexter DeVaughn, Vernon Williams, Antyone Crenshaw and Darrell Carter, all black, were placed in the non-supervisory positions of technicians.

15.     Prior to April 2003, Plaintiffs and their four white counterparts each held positions as Chief Technicians in different Mobile-area facilities.  There was no distinction between the job duties of the black Chief Technicians and the white Chief Technicians. (Pls.' Br. Supp. Resp. Summ. J. at 3).

16.     Plaintiffs now bring this action pursuant to Title VII of the Civil Rights Act of 1991,

42 U.S.C. §2000e, for unlawful discrimination based on Defendant FMCNA's failure to promote them to the supervisory positions filled by the white candidates. (Complaint, Doc. 1-1, p. 6,7).

17. Plaintiffs also seek redress against Defendant FMCNA for violation of 42 U.S.C. §1981 for unlawful discrimination based on Defendant FMCNA's failure to promote them to the supervisory positions filled by the white candidates. *Id*. at 7.

18. Plaintiffs further proffer a claim of Retaliation under Title VII based on a hostile work environment created as a result of Plaintiffs' exercise of their federally protected rights. *Id*. at 8-9.

19. Finally, Plaintiffs assert a claim of Retaliation pursuant to 42 U.S.C. §1981 based on a hostile work environment created as a result of Plaintiffs' exercise of their federally protected rights. *Id*. at 9-10.

## II.   Employees in Question

### *White Supervisors*

19. **Tony Chapman**

   a.   Was hired by FMCNA as a Chief Technician in August, 1990 and, at the time of the restructuring, had the longest tenure as a Chief Technician. (Def.'s Mem. Supp. Summ. J. at 6-7).

   b.   During his employment with FMCNA he was also an Area Chief Technician over the clinics in Pritchard and Bay Minette. *Id*. at 7.

   c.   Though he did not permanently remain an Area Chief Technician, he still retained the pay increase he received as a result of the promotion after he resumed his role as only a Chief Technician. (Pls.' Br. Supp. Resp. Summ.

J. at 16).

d.      At different times during his tenure with FMCNA, Chapman had direct supervisor responsibility over Plaintiffs Antyone Crenshaw and Darrell Carter.  (Def.'s Mem. Supp. Summ. J. at 7.)

e.      Chapman is a high school graduate and has an associates degree in electronics.  *Id.*

f.      Chapman also completed all three parts of FMCNA's Technical Validation Program[2] in 1997.  *Id.*

20.    **Clint Freeman**

a.      Freeman was hired by one of FMCNA's predecessor corporations on October 10, 1994 as a Chief Technician at the Toulminville clinic.  (Def.'s Mem. Supp. Summ. J.  at 8).

b.      He was trained by Tony Chapman and Ricky Morton for this position.  *Id.*

c.      In addition to his responsibilities as Chief Technician at Toulminville, Freeman also handled technical duties for hospital acute care.  *Id.*

d.      He was also responsible for opening up and running the technical operations at the Port City clinic in 2001.  *Id.*

e.      Because of this added responsibility, Freeman was promoted to Area Chief Technician over the Toulminville and Port City clinics.  (Pls.' Br. Supp. Resp. Summ. J. at 17).

f.      However, later in 2001, he accepted a voluntary demotion to only have the

---

[2] FMCNA's Technical Validation Program is a three part test covering various knowledge and skills pertinent to kidney dialysis.  (Def.'s Mem. Supp. Summ. J. at 7-8.)

responsibilities of a Chief Technician over one clinic, yet still retained his Area Chief Technician pay.  *Id*.

g.    Freeman is a high school graduate and has a two year diploma in electronics from Southwest State Technical College.  (Def.'s Mem. Supp. Summ. J. at 9).

h.    He has also completed all three parts of the FMCNA's Technical Validation Program.  *Id*.

21.   **Ricky Morton**

a.    Morton was hired by FMCNA in 1993 as a Reuse Technician.  (Def.'s Mem. Supp. Summ. J. at 9).

b.    In 1994, he was promoted to Equipment Technician at the East Mobile clinic where he worked for approximately two months under Plaintiff Carl Coker. *Id*.

c.    In 1998, Morton was promoted to Chief Technician at the Dauphin Island Parkway clinic.  *Id*.

d.    In 2001, he was again promoted to Area Chief Technician over the Dauphin Island Parkway and Mobile clinics.  *Id*.

e.    In 2003, Morton was Chief Technician for the Dauphin Island Parkway and Magnolia clinics.  *Id*.

f.    Morton has a high school degree and passed all three parts of FMCNA's Technical Validation Program in 1998.  *Id*. at 10.

22.   **Hayes McQueen**

a.    McQueen has been employed with FMCNA or one of its predecessors since

December 7, 1987.  Initially he was hired as a Setup Technician.  (Def.'s Mem. Supp. Summ. J. at 10).

b.  Prior to reorganization, he had the longest tenure with the company.  *Id*.

c.  McQueen was promoted to the position of Chief Technician of the University of South Alabama Clinic in 1995.  *Id*.

d.  McQueen was also made Area Chief Technician over the University of South Alabama and West Mobile clinics, resulting in a pay increase.  *Id*. at 11.

e.  In 2000, however, his responsibilities only included that of Chief Technician for the West Mobile clinic.  *Id*.

f.  In September, 2002, McQueen received a disciplinary write-up for allowing his clinic to run out of liquid bicarbonate.  *Id*.

g.  McQueen is a high school graduate with three years of active military service.  *Id*.

h.  He has completed all three parts of FMCNA's Technical Validation Program. *Id*.

***Black Plaintiffs***

23.  **Carl Coker**

a.  Coker was hired by a FMCNA predecessor company in 1988 and began doing dialysis work in 1989.  (Def.'s Mem. Supp. Summ. J. at 14).

b.  In 1994, he was promoted to the position of Chief Technician of the East Mobile clinic.  *Id*.

c.  In addition to the East Mobile clinic, Coker was responsible for an acute care unit in a hospital, but assigned those duties, in 1996 or 1997, to Hayes

McQueen.  *Id.*

d.      In 2003, Coker was promoted to Area Chief Technician over the Mobile and East Mobile clinics.  *Id.* at 14-15.

e.      Coker is a high school graduate and passed FMCNA's Technical Validation Program in 1995.  *Id.* at 15

24.     **Antyone Crenshaw**

a.      Hired by FMCNA in 1992 as a Reuse Technician.  (Def.'s Mem. Supp. Summ. J. at 13).

b.      In 1996, he was promoted by Tony Chapman from Reuse Technician to Equipment Technician.  *Id.*

c.      In 2000, Crenshaw was again promoted, this time to the position of Chief Technician of the Mobile clinic.  *Id.*

d.      In 2001, he was granted a transfer from the Mobile clinic to the Toulminville clinic.  *Id.*

e.      At the time of restructuring, Crenshaw had not completed FMCNA's Technical Validation Program.  *Id.* at 14.

25.     **Vernon Williams**

a.      Williams was hired by Hayes McQueen in 1998 as an Equipment Technician.  (Def.'s Mem. Supp. Summ. J. at 15)

b.      In April, 2000, he was promoted to Chief Technician at the University of South Alabama clinic.  *Id.*

c.      Williams has an associates degree in Electronic Engineering and Technology. However, at the time of reorganization, he had not completed FMCNA's

Technical Validation Program.  *Id.* at 16

26.    **Dexter DeVaughn**

    a.    DeVaughn was hired by FMCNA as an Equipment Technician in 1997 by Clint Freeman.  (Def.'s Mem. Supp. Summ. J. at 16).

    b.    In 1999, he was promoted to the position of Chief Technician of the Eastern Shore clinic.  *Id.*

    c.    In 2002, DeVaughn was promoted to the position of Area Chief Technician, however, was unable to work at this position as he was on military leave from September 2002 until March 21, 2003.  *Id.*

    d.    DeVaughn is a high school graduate and has an associate's degree in electronics.  *Id.* at 17.

    e.    At the time of restructuring, he had not completed FMCNA's Technical Validation Program.  *Id.*

27.    **Darrell Carter**

    a.    In 1990, Carter was hired by FMCNA as a Reuse Technician.  (Def.'s Mem. Supp. Summ. J. at 17).

    b.    In 1993, he was promoted to Equipment Technician.  *Id.*

    c.    On July 20, 1998, Carter was promoted to the position of Chief Technician of the Mobile clinic.  *Id.*

    d.    However, in 2001, he voluntarily changed positions back to an Equipment Technician.[3]  *Id.*

---

[3] However, Carter claims that at the time of reorganization he was "acting" as the Chief Technician at the Bay Minette clinic.  (Pls.' Br. Supp. Resp. Summ. J. at 20; Carter Dep. at 43, 53).

e.      At the time of reorganization, Carter had not passed the Technical Validation

Program.  *Id*. at 18.

## LEGAL ANALYSIS

### I.      *Summary Judgment Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir. 2004) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*  A court must decide ""whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*.

The moving party bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party may discharge its "initial responsibility" by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991). To survive

summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must then come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences ... in his favor." *Four Parcels*, 941 F.2d at 1428 (internal quotations and citations omitted).

## II.    *Title VII and Section 1981 Failure to Promote Claims*

Plaintiffs bring this suit, in part, under Title VII and 42 U.S.C. §1981 alleging disparate treatment based racial discrimination due to Defendant FMCNA's failure to promote any of the Plaintiffs to the supervisory positions created as a result of the company's 2003 restructuring. Plaintiffs contend that in implementing the "centralized-technical" business plan, FMCNA essentially demoted them because of their race, rather than any legitimate/non-discriminatory reasons.[4]

### A.    **Legal Standard**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).

Section 1981 guarantees to all persons in the United States "the same right . . . to make and

---

[4] Plaintiffs, in their Response Brief (Doc. 57), seemingly attempt to assert an additional claim of discrimination stemming from a pay grade demotion occurring in October 2003.  (Pls.' Br. Supp. Resp. Summ. J. at 9).  Though this demotion may have ultimately occurred as a result of the April 2003 restructuring, it is not included in Plaintiffs' Complaint.  The only incident on which Plaintiffs base their claim of intentional discrimination for demotion/failure to promote is the selection of the white technicians to supervisory positions over the black technicians in April 2003. (Compl. at ¶¶ 16, 17, 24 & 31).  Therefore, any other incident of demotion has not been properly plead before this Court.

enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage

of the Civil Rights Act of 1991, the term "make and enforce contracts" is broadly defined as

including "the making, performance, modification, and termination of contracts, and the enjoyment

of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. §

1981(b).

Both Title VII and Section 1981 "have the same requirements of proof and use the same

analytical framework;" therefore, we will address these claims simultaneously. *Standard v. A.B.E.L.*

*Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

When asserting claims of disparate treatment, a plaintiff must demonstrate discriminatory

intent on the part of the employer. *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004).

Therefore, a plaintiff must proffer either direct or circumstantial evidence supporting their claims.

*Id*.  In the instant case, Plaintiffs do not proffer any direct evidence[5] indicating racial discrimination

regarding FMCNA's failure to promote/demotion, only circumstantial.  Therefore Plaintiffs' claims

must be examined under the  framework established in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). *Id*. at 723-24.

### 1.    *McDonnell Douglas Framework*

The  well  established  *McDonnell Douglas*  paradigm  provides  a  three  step  approach  to

---

[5] Direct evidence is evidence, that, if believed, proves the existence of a fact without
inference or presumption."  *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir.
2005)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004))(internal
quotations omitted).  Such evidence must demonstrate the existence of "a discriminatory ...
attitude correlating to the discrimination ... complained of by the employee." *Damon v. Fleming
Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999).  In other words, Plaintiff
must show that the employment decision was *motivated* by the decision-maker's racism. *Id*.
The Eleventh Circuit has held "only the most blatant remarks, whose intent could mean nothing
other than to discriminate on the basis of some impermissible factor constitute direct evidence of
discrimination." *Wilson*, 376 F.3d at 1086.  If the Court finds that the alleged statement merely
"suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id*.

analyzing claims of racial discrimination.  First, a plaintiff must establish a *prima facie* case of intentional discrimination, creating a presumption that such discrimination has occurred.  *Walker v. Mortham*, 158 F.3d 1177, 1183 (11th Cir. 1998).   Defendant then bears the burden to rebut this presumption by articulating a legitimate and non-discriminatory reason for its employment action. *Id*. at 1184.   If the defendant employer meets this burden, then the plaintiff has the opportunity to show, by a preponderance of the evidence, that the employer's proffered reasons are merely pretext. *Vessels v. Atlanta Indep. School Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).

### a.    Prima Facie Case

In order to establish a *prima facie* case of  intentional discrimination alleging failure to promote, a plaintiff must demonstrate: 1) they belonged to a protected class; 2) they applied and qualified for a job which the employer was seeking to fill; 3) despite their qualifications, they were denied the position; 4) the position was, alternatively, filled  with a person who is not a member of plaintiff's protected class. *Id*.

In the instant case, Defendant FMCNA concedes the first three elements necessary for a *prima facie* case - that Plaintiffs belong to a racial minority, are qualified and applied for the positions in question and were denied the position.  (Def.'s Mem. Supp. Summ. J. at 21).   However, Defendant  asserts that the proper standard for satisfying the fourth prong requires Plaintiffs to demonstrate that the persons filling the positions are not a member of the protected minority *and* are equally or less qualified.  The Court disagrees.

To support its position, Defendant relies on the *prima facie* standard espoused in *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).  Such a standard, in effect, would require a plaintiff to defeat, at the initial *prima facie* stage, an employer's subjective evaluations or dispute the relative qualifications of those who were hired.  This onerous burden on the plaintiff "cannot be

squared with the structure and purpose of the *McDonnell Douglas* framework." *Vessels*, 408 F.3d

at 769 (citing *Walker*, 158 F.3d at 1192-93). Though *Lee* is a 2000 panel decision, it is in direct

conflict with *Walker*, another panel decision, that specifically addresses the question of whether

relative qualifications are to be included in the fourth prong of the *prima facie* standard. *See Norrell*

*v. Waste Away Group, Inc.*, 246 F.Supp.2d 1213, 1222 n.10 (M.D. Ala. 2003).

        The *Lee* decision is in the progeny of cases stemming from the *prima facie* standard created,

in dicta, from *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 n. 7 (11th Cir., 1983).[6] In

*Perryman*, the Eleventh Circuit noted that plaintiffs in promotion discrimination cases are subject

to a *prima facie* standard that requires them to demonstrate that "employees with equal or lesser

qualifications who were not members of the protected minority were promoted." 698 F.2d at 1142

n. 7 (citing *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980)).[7] Despite

the *Perryman* court's citation, the *Walker* panel submits that the well established *Crawford* standard

does not, in fact, support the notion of including relative qualifications in *prima facie* analysis. 158

F.3d at 1186-87. Therefore, the *Walker* panel stated, "in regard to the proper prima facie standard,

we are faced with two conflicting lines of precedent." *Id.* at 1188. However, "[i]n deciding which

line of precedent to follow [*Perryman* or *Crawford*] we are, ironically, faced with two conflicting

lines of precedent." *Id.* The *Walker* court determined that "when circuit authority is in conflict, a

---

        [6] *Lee* cites *Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir. 1999) for the standard which, in turn, cites *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988) which derives its standard from the *Perryman* footnote.

        [7] In 1980, the *Crawford* court established a *prima facie* analysis for a plaintiff who "loses out" to another applicant in competition for a promotion. *Walker*, 158 F.3d at 1186. The standard proffered in *Crawford* states: "plaintiffs may establish a prima facie violation by showing that they are members of a group protected by Title VII, that they sought and were qualified for positions that [the employer] was attempting to fill, that despite their qualifications were rejected, and after their rejection [the employer] continued to attempt to fill the positions or in fact filled the positions with [persons outside the protected class]." 614 F.2d at 1315.

panel should [either] look to the precedents that are most consistent with the Supreme Court cases or the weight of authority within the circuit ... [or] look to the line of authority containing the earliest case." *Id*. Finding that the "earliest case" rule was the correct intra-circuit conflict rule to follow, the panel determined that the *Crawford* standard, which predates *Perryman* and does not require an analysis of relative qualifications at the *prima facie* stage, is the applicable standard.[8] *Id*. at 1188-89.

The *Walker* court further noted that *Perryman* runs contrary to the policies underlying the *McDonnell Douglas prima facie* case. *Id*. at 1192. Under *McDonnell Douglas*, once a plaintiff establishes a *prima facie* case, the presumption of discrimination is shifted to the defendant employer. *Id*.

> This presumption ensures that a plaintiff who cannot establish that the employer harbored a discriminatory animus ... may still survive a motion for judgment as a matter of law ... and thus force the employer to articulate its motives for the challenged employment decision so that the plaintiff has an opportunity to raise an inference of intentional discrimination by circumstantial evidence. The presumption, therefore, accounts for the disparity in access to information between employee and employer regarding the employer's true motives for making the challenged employment decision.

*Id*.

The *Crawford* standard addresses the disparity by permitting a plaintiff to establish a *prima facie* case with evidence that is already in the employees possession, "membership in a protected class, qualification, the fact of application for the position, and rejection." *Id*. However, by introducing relative qualifications into *prima facie* analysis, the *Perryman* standard requires the plaintiff to submit evidence that is neither easily obtainable nor objectively verifiable. *Id*. at 1192-93. Only the employer knows what qualifications were actually examined, if any, and how the plaintiff "ranked" in the decisionmaker's mind. *Id*. at 1193. Therefore, the *Walker* court held that

---

[8] The court also noted that their holding would be the same if they followed the alternative "Supreme Court" rule . *Walker*, 158 F.3d at 1188 n. 24.

the burden of articulating those relative qualifications must be on the defendant employer, not the employee.  *Id.*  Based on that analysis, they held, "although a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then; [they] need only prove that [they themselves were] qualified to perform the coveted job."  *Id*. *See also Vessels*, 408 F.3d at 769 ("the prima facie case is designed to include only evidence that is objectively verifiable.")

Therefore, following the sound logic and legal analysis in *Walker*, and more recently in *Vessels*, this Court will not require that Plaintiffs address any question as to relative qualifications when proffering evidence of a *prima facie* case of intentional discrimination for failure to promote. Rather, Plaintiffs must only show that they were objectively qualified to perform the job position at issue.

In the instant case, as already stated, Defendant FMCNA concedes that Plaintiffs were minimally qualified for the supervisory positions.    Furthermore, based on the *Vessels/Walker/Crawford* standard, Plaintiffs must only demonstrate that the positions were filled by persons who were not members of Plaintiffs' protected class to satisfy the fourth element of the *prima facie* standard.  It is undisputed that Plaintiffs are all African-American and the persons filling the supervisory positions are all white.  Therefore, the Court finds that Plaintiffs have established a *prima facie* case of intentional discrimination for failure to promote.

### b.        Legitimate and Nondiscriminatory Reasons

Once plaintiffs have established a *prima facie* case of intentional discrimination, the defendant employer may then rebut the presumption by articulating a legitimate, nondiscriminatory reason for not promoting plaintiffs. *Walker*, 158 F.3d at 1184.  This rebuttal burden is "exceedingly

light," *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir.1988), and is one of production, not persuasion, as the ultimate burden of proving the existence of purposeful discrimination by a preponderance of the evidence remains on the plaintiffs at all times. *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989). If FMCNA produces such rebuttal evidence, "the presumption of discrimination is eliminated." *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)(*en banc*). However, "[a]lthough this burden is not 'onerous,' neither is it a formality." *Walker*, 158 F.3d at 1184. Defendant is required to at least "raise genuine issue of fact as to whether it discriminated against the plaintiff by making that decision." *Id*. (citing *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981))(internal quotations omitted). "In other words, the defendant must clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision, and that reason must be legally sufficient to justify a judgment for the defendant." *Id*. (internal quotations omitted).

In the instant case, Defendant FMCNA has proffered the testimony of Elliot Sierra via his June 2005 deposition and July 2005 28 U.S.C. §1746 declaration (hereinafter "declaration").[9] Though Plaintiffs claim that there is a genuine issue of material fact as to whether he was the "decisonmaker" for the employment action, they have proffered little more than their own opinions and conjecture. In fact, the only evidence they have submitted beyond their own beliefs is the "Centralized Technical Program Implementation Timeline" (hereinafter, "Timeline")(Doc. 58-36, Pls.' Ex. 20). Plaintiffs allege that this chart identifies Susan Stanfield, the Regional Manager, as the individual responsible for appointment of department supervisors. However, theTimeline does not name Stanfield specifically and FMCNA has never indicated that anyone other than Elliot Sierra

---

[9] Plaintiffs have objected to Sierra's declaration, however, the Court has denied (Doc. 92) their Motion to Strike.

had the final say as to the supervisory promotions.  Furthermore, the Timeline has not be authenticated as there is no evidence as to where Plaintiffs obtained it.  It also indicates that the Regional Manager made the hiring decision, even though this position no longer existed at the time of the restructuring.  (Doc. 83-48, Ex. 36, p. 2).  Though, as Defendant concedes, Stanfield had input into the decisionmaking process, there is no evidence that Sierra was not still the ultimate decisionmaker.

As stated in his declaration, Sierra isolated the four supervisory positions that were created as a result of the restructuring.  (Sierra Decl., Doc. 49-3).  Then, descending from the highest ranking of these positions, filled each one with the candidate he felt was most qualified.  *Id*.  As he has testified, Sierra utilized a number of factors in making this determination.  *Id*.  In his deposition, Sierra indicated that his past experience with the candidates affected which individual he would promote.  (Sierra Dep. at 75).  He further elaborated that the past experiences relevant to the promotion decision included timeliness of reporting, general upkeep of facility, overall cooperation and willingness to go above and beyond.  *Id*.  He also examined leadership skills in determining who to promote.  *Id*. at 81.  In his declaration thoroughly outlining the candidates' qualifications, Sierra further implicates these criteria.  Elaborating on the past experience criteria he mentioned in his deposition, Sierra indicates seniority, work ethic, communication skills, responsibility and dependability factored into his decision.  (*See* Sierra Decl.).  Based his testimony, the criteria Sierra utilized, though predominantly subjective, is clearly legitimate and nondiscriminatory.

### c.    Evidence that Defendant's Proffered Reason are Pretextual

Though the *McDonnell Douglas* framework employs a shifting burden of production, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff."  *Wilson*, 376 F.3d at 1088 (quoting *Burdine*, 450

U.S. at 253, 256 (1981))(internal quotations omitted).  Therefore, in order to prevail on a claim of this nature, a plaintiff must "either prov[e] that intentional discrimination motivated the employer or produc[e] sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer ... ." *Wilson*, 376 F.3d at 1088.

However, once a defendant has proffered a legitimate and nondiscriminatory reason that might motivate a reasonable employer, the plaintiff cannot simply recast that reason or substitute his business judgment for that of the employer.  *Chapman*, 229 F.3d at 1030.  Rather, the plaintiff employee is required to "meet that reason head on and rebut it ... ."  *Id.*  The Court further notes that "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions ... Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Id.* (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(internal quotations omitted); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)(An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *accord Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether employment decisions are prudent or fair.")

Just as Plaintiffs are not permitted to recast Defendant FMCNA's proffered reasons, nor shall this Court.  *Chapman*, 229 F.3d at 1030 n. 19.  In FMCNA's Corrected Motion and Supporting Memorandum (Doc. 49) for Summary Judgment, it contends that each supervisor position was filled by the person Elliot Sierra deemed best qualified based on his past experiences with each employee and based on each employee's work history.  (Def.'s Mem. Supp. Summ. J. at 22).  Therefore, it is

Plaintiffs' burden to either demonstrate evidence of intentional discrimination or produce evidence that may lead a rational trier of fact to disbelieve FMCNA's proffered reason. *Wilson*, 376 F.3d at 1088. Based on their Brief in Response (Doc. 57) to the Motion for Summary Judgment, Plaintiffs attempt to discredit FMCNA's articulated reason by presenting evidence indicating the following: 1) Pay disparity along racial lines among Chief Technicians prior to the restructuring; 2) discrepancies between FMCNA's EEOC Response and their proffered criteria for the promotion in this suit; 3) that several of the promoted candidates were not minimally qualified for the supervisory positions; 4) that the promoted candidates were not as qualified as the Plaintiffs.

### i.     Pay Disparity

In their response brief, Plaintiffs make much of what they claim is a pay disparity between the white and black chief technicians prior to the subject employment actions in April 2003. They assert that it is a lingering effect of past discrimination and is quite probative in demonstrating discriminatory intent.

Initially, the Court notes, Plaintiffs indicated that all the black chief technicians were hired at lower rates and promoted slower than their white counterparts. (Crenshaw Dep., p. 117-118; DeVaughn Dep., Vol. II, p. 53). However, in their response brief, Plaintiffs base their argument on wage rates at the time of restructuring. Upon further examination, the Court finds all of these claims, at best, inconclusive.

Regarding the starting pay of Chief Technicians, there does not seem to be any racially distinct disparity at all. As FMCNA has suggested, such an analysis is complicated by the fact that not all of the candidates started as Chief Technicians at the same time. Comparing those that did begin as Chief Technician at relatively the same time, though, clearly indicates no racial preference. For example, Clint Freeman (starting chief technician pay: $12.50), Carl Coker ($10.14), and Hayes

McQueen ($9.56) all became Chief Technicians between 1994 and 1995.  In addition, Antyone Crenshaw ($12.50), Darrell Carter ($12.00), Dexter DeVaughn ($11.01) and Ricky Morton ($10.75) all became Chief Technicians between 1998 and 2000.

In response to Plaintiffs' claim that the black employees were promoted slower, the Court again finds this to be a weakly supported position.  First, it is difficult for the Court to analyze such a claim in this case, as only two plaintiffs (Crenshaw and Carter) and one supervisor (Morton) entered FMCNA at the same position (Re-use Technician).  Though Morton did ascend to Chief Technician at a more rapid pace (5 years for Morton versus 8 years for Crenshaw and Carter), among 9 candidates, this comparison alone cannot support an overall conclusion that whites were promoted quicker than blacks.  This is particularly true in light of the fact that the remaining plaintiffs, Coker, Williams and DeVaughn, became Chief Technicians in 6 years, 2 years and 2 years, respectively, while Hayes McQueen, the only other supervisor besides Morton who was not initially hired at the Chief Technician position, took 8 years to reach that status.  In addition, looking at the time it took the candidates to be promoted from Equipment Technician to Chief Technician (Morton - 4 years; Crenshaw - 4 years; Coker - 2 years; Williams - 2 years; DeVaughn - 2 years; Carter - 5 years)[10], there again seems to be no notable disparity.

Finally, in examining the wages of the Chief Technicians at the time of restructuring, the Court, again, can find no evidence of a disparity that would indicate discriminatory intent or motives.  Though Plaintiffs submit a detailed chart purportedly demonstrating the racial disparity, upon examination, the Court finds that their evidence is somewhat misleading.  As Defendant FMCNA notes, the date of restructuring was April 2003.  However, Plaintiffs' table submits data

---

[10] The record is unclear in regard to when McQueen became an Equipment Technician, so the Court is unable to include him in this analysis.

that was effective March 1, 2003.  It is unclear what significance this date has in relation to the case *sub judice*.  Examining the wage data effective April 1, 2003, as FMCNA suggests, demonstrates that Carl Coker's promotion on March 3, 2003 to Area Chief Technician increased his pay from $16.47 per hour, as Plaintiffs proffer, to $18.47 per hour.  (Doc. 82-50, Def.'s Ex. 38).  This rate is greater than the reported rate of Ricky Morton and comparable to those of Clint Freeman and Hayes McQueen.  Furthermore, Plaintiffs' inclusion of Darrell Carter in the table is further misleading as he was not even a chief technician at the time of the submitted data.  Rather, he asked to step down from his responsibilities as a Chief Technician in 2001 and stayed on with FMCNA as simply an Equipment Technician.  (Carter Dep. at 28).  As to the disparity between the white Chief Technicians and the remaining Plaintiffs (DeVaughn, Williams and Crenshaw), FMCNA claims that the wage difference is due to the white Chief Technicians having longer tenure at that position, the white candidates having worked as Area Chief Technicians early in their tenure and higher performance evaluation scores.  In regards to these explanations, Plaintiffs have not demonstrated any evidence of falsity or racial discrimination.  Furthermore, the Court is not inclined to partake in an exhaustive analysis of these or any other issues regarding an alleged racially motivated pay discrepancy prior to the restructuring, as it is not the discrimination complained of in this matter.  Rather, Plaintiffs' claims in this suit revolve solely around FMCNA's failure to promote in April 2003.  Though the Court will consider it in conjunction with Plaintiffs' other circumstantial evidence, the Court does not find that the purported pre-restructuring pay disparity alone establishes FMCNA's articulated reason for its employment decision is pretextual.

### ii.    Discrepancy in Criteria

Plaintiffs also cite alleged discrepancies between the criteria FMCNA relied on in making the promotion decisions as stated in its EEOC Response and what the FMCNA, through  Elliot

Sierra, has articulated as the legitimate and nondiscriminatory reason in this summary judgment analysis. They contend that the alleged discrepancies create a genuine issue of material fact as to the whether FMCNA's explanation is worthy of credence. This Court, however, does not find such alleged discrepancies.

As already stated, FMCNA asserts that each supervisor position was filled by the person Elliot Sierra deemed best qualified based on his past experiences with each employee and based on each employee's work history. This is consistent with Sierra's testimony in both his June 2005 deposition and July 2005 declaration.[11] However, Plaintiffs allege that FMCNA's EEOC Response in this matter presents a reasoning for the employment decisions that is contrary to what FMCNA has offered in seeking summary judgment. Specifically, Plaintiffs claim that the EEOC report focuses on three areas that FMCNA says affected Sierra's decision: 1) annual technical audits; 2) recent annual personnel evaluations and 3) the timeliness and quality of monthly chief tech status reports. (Pls.' Br. Supp. Resp. Summ. J. at 9).

As noted by Defendant FMCNA, it is not clear that the EEOC report so heavily relied upon by Plaintiffs was ever intended to be a comprehensive explanation for each employment decision. (Def.'s Mem. Supp. Summ. J. at 5 n.5). Rather, it was simply FMCNA's initial response to a claim against it and only one portion of a multi-faceted investigation. *Id.* Furthermore, upon analysis of all of Sierra's relevant testimony, the Court does not find that the EEOC Response and the reasonings submitted in the motion for summary judgment are necessarily contradictory. FMCNA contends, as Sierra has testified, that the promotion decisions were based on the candidates' work history and Sierra's past experience with them. As Sierra has stated, included in his past experience

---

[11] The Court analyzed the consistency of Sierra's testimony between his deposition and declaration in ruling (Doc. 92) on Plaintiffs' Motion to Strike.

with the candidates was his administration of the annual technical audits and reviewing annual personnel evaluations. (Sierra Dep. at 71-72). Though he may not have specifically pulled out the files and looked over all of these documents during the promotion process, he did indicate that such action was unnecessary based on his high level of familiarity with the candidates from having worked with them since 1996. *Id.* Though FMCNA may now submit specific evaluations, reports or audits regarding the candidates, they only seem to be introduced to bolster the propriety of Sierra's opinions and decisions. The Court does not find that there are any material discrepancies or inconsistencies between FMCNA's EEOC response and the reasons for their employment actions now submitted to support their motion for summary judgment. Therefore, as to this matter, the Court cannot find that there are any issues of material fact that could lead a rational trier of fact to find FMCNA's proffered explanation is without credence.

### iii.    Minimal Qualifications

Plaintiffs next contend that three of the white candidates were ineligible for the supervisory positions based on the job description for these positions. The job description in question reads: "Associates degree in electronics, Bio Medical Engineering or equivalent preferred." (Doc. 49-13, p. 12, Def.'s Ex. 60). Plaintiffs submit that this requirement should be read as *requiring* an associates degree with FMCNA preferring that the degree be in electronics, Bio Medical Engineering or an equivalent. Defendants, however, contest that an associates degree was not required and that "preferred" modified the entire education requirement of even having a degree.

Without attempting to dissect what FMCNA may or may not have meant by these job descriptions, the Court notes that they were not even approved until after Sierra had made his selections. Furthermore, FMCNA has never suggested that a certain educational level was

determinative, or even a factor, in determining which candidates were promoted to the supervisory positions.   Therefore, the Court does not find that the job description issued post-promotion somehow indicates that the candidates selected as supervisors were unqualified at the time of selection.   In the instant case, the Court finds that the education of the candidates is more appropriately considered when analyzing the relative qualifications of the candidates.

### iv.      Relative Qualifications

A plaintiff cannot establish pretext by simply demonstrating that they are more qualified than the non-protected class individual who was promoted in their stead.  *Cooper*, 390 F.3d at 744; *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001).  Rather, they must demonstrate a disparity in qualifications that is "so apparent as to virtually jump off the page and slap you in the face."  *Cofield*, 267 F.3d at 1268 (citing *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001)).

Plaintiffs have submitted much evidence which, they contend, demonstrates that they are more qualified than the white candidates that actually were promoted to the supervisory positions. Therefore, the Court analyzes the hiring decision for each of the four supervisory positions and determine whether the qualifications of any or all of the Plaintiffs "slap us in the face" as far superior to that of the individual holding that position.

### *Centralized Technical Program Manager*

#### Tony Chapman

Without restating every virtue submitted by FMCNA as to his qualifications or all of the disparagements asserted by Plaintiffs, the Court finds that Plaintiffs have not made a  "slap you in the face" showing  that any of them were vastly more qualified for this position than Chapman.  The Court does note, however, that Chapman, of all the candidates, had the longest tenure as a Chief

Technician and had served as an Area Chief Technician.  Furthermore, the Court notes that Plaintiffs Coker, Carter and Crenshaw all stated in their depositions that either Chapman deserved this position or that they did not object to his promotion to it.  (Coker Dep. at 94; Carter Dep. at 77; Crenshaw Dep. at 81).

### *Regulatory Compliance Supervisor*

#### **Clint Freeman**

Again, without rehashing the arguments of both sides in this order, the Court finds that Plaintiffs have not shown a great enough disparity between the qualifications of themselves and Freeman to indicate that the reasons asserted by FMCNA for promoting him were pretextual. However, the Court does point out that Freeman does, along with Plaintiff Coker, have the second longest tenure at the Chief Technician position, as well as having served as an Area Chief Technician.  Furthermore, even Plaintiff Coker stated that he felt Freeman deserved the position. (Coker Dep. at 94).

### *Inventory Supervisor*

#### **Hayes McQueen**

Upon review of McQueens qualifications for his supervisory position, the Court, again, does not find that any of the Plaintiffs have a resume that would indicate that Sierra's reasons for selecting McQueen as Inventory Supervisor were a fraud.  However, the Court does find that McQueen's disciplinary write-up in September 2002 is significant.  Based on FMCNA's policy regarding promotions and transfers, employees being considered for promotion must be in good standing.  (Doc. 82-37, Def.'s Ex. 25).  The policy further states, "Good standing is defined as having no disciplinary actions initiated during the past year or currently pending." *Id*.  Based on this definition, it is clear that McQueen was not in good standing at the time of his promotion and, thus,

should have not been eligible.  Though the policy provides the Regional V.P./Regional Manager/Regional Director with some latitude to make exceptions to the policy, the Court finds that FMCNA's decision to promote a white employee who was not in good standing under their promotion policy over five employees who were in good standing is sufficient to raise a genuine issue of material fact as to whether the decision was racially motivated.  Therefore, we hold that as to the position of Inventory Supervisor, Defendant FMCNA's Motion for Summary Judgment is **due to be DENIED**.

### *Technical Supervisor*

#### **Ricky Morton**

Finally, as to the position of Technical Supervisor, the Court does not find that any of the Plaintiffs' qualifications "slap us in the face" as being far superior to Ricky Morton.  Though he had the shortest tenure as a Chief Technician of all the promoted supervisors, his was still longer than all but one of the Plaintiffs.  The Court does note that Plaintiff Carl Coker had a longer tenure as a Chief Technician and had actually trained Morton as for that position.  Further, Sierra indicated that of all the Plaintiffs, he considered Coker to be the most qualified for a supervisory position.  However, Sierra also noted that he did not promote Coker because his skills in leadership and communication, no doubt important in a managerial position, were lacking.  In support of this opinion, FMCNA has submitted documentation where Coker was critiqued on his communication skills and he acknowledged in his deposition that he had been lenient with his subordinates in some areas.  (Doc. 82-42, 43, 44, 45; Def.'s Exs. 30-33; Coker Dep. at 142).  Therefore, despite Coker's seniority, the Court does not find that his qualifications are so far superior to Ricky Morton's as to demonstrate an improper motive by FMCNA.

**CONCLUSION:       Title VII and §1981 Failure to Promote Claims**

Based on the above analysis and after examining all of Plaintiffs' proffered circumstantial evidence in support of their assertion that FMCNA's legitimate and nondiscriminatory reason is merely pretext, the Court finds that Defendant FMCNA's Motion (Doc. 49) for Summary Judgment is **due to be and hereby GRANTED IN PART and DENIED IN PART**.  As to Plaintiffs' claim alleging intentional racial discrimination in failing to promote one of them to the position of Inventory Supervisor, the Court finds that they have raised a genuine issue of material fact as to Defendant FMCNA's intent; therefore, the summary judgment ruling as to this claim is **hereby DENIED**.  However, the Court finds that as to their claims regarding the other three employment positions, taking the facts in a light most favorable to the non-movant Plaintiffs, there is no genuine issue of material fact and summary judgment is **hereby GRANTED**.

III.   *Title VII and Section 1981 Retaliation Claims*

Plaintiffs Crenshaw and Williams allege that they were suspended for falsifying time records in retaliation for filing their charges with the EEOC and this suit.[12]  On the nights of May 3 and 4, 2004, these Plaintiffs worked late for FMCNA.  Both men indicated on their time sheets that they worked until 12:30 a.m.  Later, upon noticing that a lot of overtime was being logged, Chapman looked through the records and found Plaintiffs' time sheets.  Chapman investigated whether Crenshaw and Williams had actually worked until the time stated on their time sheets and discovered that they had not.  Based on this he suspended the two Plaintiffs.  Though there is some dispute as to the actual time that they did work until, Williams acknowledged in his deposition that he did not work until 12:30 am as he had indicated on his time sheet.  (Williams Dep. at 272).

---

[12] Based on FMCNA's Summary Judgment brief, there is some indication of a possible retaliation claim based on incidents surrounding Plaintiff DeVaughn.  However, Plaintiffs have not rebutted FMCNA's explanation for these events, therefore, any retaliation claim based on these incidents have now been waived.

#### A.      Legal Standard and Analysis

Just as with their intentional discrimination claim, Plaintiffs must first establish a *prima facie* case.  *Coutu v. Martin County Bd. of County Comm'rs*, 437 F.3d 1068, 1074 (11th Cir. 1995).  To do so with a retaliation claim, the employee must show: 1) they engaged in protected activity; 2) the employer was aware of the activity; 3) they suffered and adverse employment action; 4) there is a causal link between the protected activity and the adverse employment action.

Even assuming that Plaintiffs' carry their burden of demonstrating a *prima facie* case, it is clear to the Court that they cannot rebut Defendant FMCNA's legitimate and nondiscriminatory reason for disciplining them.  Plaintiffs may have worked late on the nights in question, but they were disciplined for falsifying their time sheets, which at least one of them admits to doing. Therefore, the Court finds that as to Plaintiffs' claims of retaliation under Title VII and 28 U.S.C. §1981, Defendant FMCNA's Motion (Doc. 49) is **due to be and hereby GRANTED**.

### IV.    *Motion to Strike Exhibits*

Plaintiffs have Motioned (Doc. 83) this Court to Strike several of Defendant's exhibits purporting to be letters written by the EEOC.  Plaintiffs cite as grounds for their motion that these letters constitute hearsay, are lacking in probative value and are overly prejudicial.  Without delving into the propriety of these assertions, the Court holds that it did not utilize the exhibits in its analysis of the legal issues presented for summary judgment.  Therefore, the Court finds that making a ruling on such exhibits is unnecessary and Plaintiffs' Motion (Doc. 83) is **hereby DENIED**.

### CONCLUSION

Based on the above analysis, Defendant FMCNA's Motion (Doc. 49) for Summary Judgment is **due to be and hereby GRANTED IN PART and DENIED IN PART**.  As to Plaintiffs' claim of intentional discrimination in failure to promote regarding the position of Inventory Supervisor,

FMCNA's motion is **hereby DENIED**.   As to Plaintiffs' remaining claims of intentional discrimination regarding the other three supervisory positions and Williams's and Crenshaw's claims of retaliation, FMCNA's motion is **hereby GRANTED**.

  **So ORDERED**, this 7th day of February, 2006.


_____s/ W. B. Hand_____
SENIOR DISTRICT JUDGE